Stephen A. Donato
Charles J. Sullivan (*pro hac vice pending*)
Grayson T. Walter (*pro hac vice pending*)
BOND, SCHOENECK & KING PLLC
One Lincoln Center
Syracuse, New York 13202
Telephone: (315) 218-8000
Facsimile: (315) 218-8100

*Proposed Counsel to the Debtor
and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| JOHN HASSALL, INC.[1] | )    Chapter 11 |
| | ) |
| Debtor. | )    Case No. 14-71961 (AST) |
| | ) |

**AFFIDAVIT OF THEODORE B. SMITH, III PURSUANT TO LOCAL RULE 1007-4
IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | )    ss. |
| COUNTY OF NASSAU | ) |

Theodore B. Smith, III, having been duly sworn, hereby deposes and says as follows:

1.       I am the President and Chief Executive Officer of John Hassall, Inc. (the

"Company" or the "Debtor"), the above-captioned debtor and debtor in possession.  In such

capacity, I am familiar with the Debtor, its business, operations and financial affairs and I am

qualified to make this affidavit (this "Affidavit") on behalf of the Debtor in accordance with

Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York.

---

[1]  The Debtor's principal place of business is located at 609-1 Cantiague Rock Road, Westbury NY 11590 and the last four digits of the Debtor's federal taxpayer identification number are 3980.

2.     On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq*., the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of New York (the "Court"), commencing the Debtor's chapter 11 case (this "Chapter 11 Case").  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for a trustee or examiner has been made in this Chapter 11 Case and, as of the date of the filing of this Affidavit, no official committees have been appointed or designated.

3.     Contemporaneously herewith, the Debtor has filed or soon will file the motions and applications described below (collectively, the "First Day Pleadings").[2]  I have reviewed and am familiar with the contents of each of the First Day Pleadings (including the exhibits and schedules thereto) and I believe that the relief requested therein is necessary to minimize disruption to the Debtor's business, to enable a smooth and effective transition into chapter 11, to preserve and maximize the value of the Debtor's estate, and, ultimately, to enable a successful result in this Chapter 11 Case.  I also believe that the Debtor and its estate would suffer immediate and irreparable harm in the event the Debtor is not able to access cash collateral and debtor in possession financing to make certain essential payments and otherwise continue conducting ordinary course business operations as sought and described in greater detail in the First Day Pleadings.

4.     Except as otherwise indicated, the facts set forth in this Affidavit are based upon my personal knowledge of the Debtor's business and operations, my review of relevant documents, information provided to me or verified by other executives or employees or

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the First Day Pleadings.

2302963.5

consultants to the Debtor, and my personal opinion based upon my experience, knowledge and information concerning the Debtor and the industry in which it operates.  I am authorized to submit this Affidavit on behalf of the Debtor and, if called upon to testify, I would competently testify to the facts set forth herein.

### Background

5.    The Debtor is a closely-held New York corporation formed in 1907 and represents the continuation of a manufacturing business that dates back to 1850.  The Debtor's principal office, sole place of business, and the location of its primary assets and books and records is 609-1 Cantiague Rock Road, Westbury, New York 11590.  The Debtor is not a "small business debtor" within the meaning of section 101(51)(D) of the Bankruptcy Code.

6.    The Debtor's primary business is the design, manufacture, testing and marketing of highly specialized niche application fasteners for use in the aerospace, automotive, defense, and commercial industries.  The Debtor maintains a vertically integrated facility enabling it to produce custom-designed parts on either a mass production or short-run basis through multi-station cold forming, hot forging, and a variety of sophisticated secondary operations such as precision turning, centerless grinding, broaching, thread rolling, heat treating, as well as product testing in the Debtor's full metallurgical laboratory.

7.    The Debtor's skilled workforce and state of the art equipment allow the Debtor to manufacture its fastener products to the stringent tolerances required for incorporation into jet aircraft turbines and other high-precision applications.  The Debtor has obtained certification from the National Aerospace and Defense Contractors Accreditation Program (NADCAP) for general quality systems and heat treatment; and maintains third party ISO 9001:2008, QS 9000 and AS9100-C certifications.  Additionally, the Debtor's long history of making high-quality

2302963.5

products has enabled the Debtor to obtain supplier quality assurance requirements (SQAR) and laboratory control at source (LCS) approvals from many of its customers including Pratt & Whitney, GKN, Honeywell, GE, Rolls Royce and others. These SQAR/LCS approvals are highly coveted and allow the Debtor to ship directly to customers' production lines instead of having to first undergo quality control testing by the customer.

8.     As of the Petition Date, the Debtor had a total of 52,293.14 shares of voting and non-voting common stock issued and outstanding, the majority of which are owned by me. Pursuant to a Stock Redemption Agreement dated as of October 1, 2010, the Debtor agreed to redeem 17,555.56 shares (the "Redeemed Shares") from certain members of the Smith family other than myself (the "Smith Family Shareholders"). The Redeemed Shares are currently held in escrow to secure the redemption price to be paid by the Debtor. On April 8, 2014, the Debtor received notice from the Smith Family Shareholders that the Debtor was in default under the terms of the Stock Redemption Agreement.

9.     The Debtor's senior management is comprised as follows:

a.     Theodore B. Smith, III, President and Chief Executive Officer: I have been with the Debtor for 24 years and have served as its President and Chief Executive Officer for 10 years. In such capacity, I am responsible for overseeing and directing all of the Debtor's business operations.

b.     Phillip Biello, Controller: Mr. Biello has been with the Debtor for over 20 years. In his capacity as Controller, Mr. Biello is responsible for overseeing the Debtor's financial affairs and restructuring efforts as well as the Debtor's invoicing, collections and vendor payments as well as maintaining the Debtor's books and records.

c.     Al Polidoro, Quality Assurance and Plant Manager: Mr. Polidoro has been with the Debtor for over 20 years. In his capacity as Quality Assurance and Plant Manager, Mr. Polidoro is responsible for overseeing the Debtor's manufacturing operations and quality control.

d.     James Spagnuolo, Engineering Manager. Mr. Spagnuolo has been with the Debtor for over 20 years. In his capacity as Engineering Manager, Mr.

2302963.5

Spagnuolo is responsible for overseeing all engineering issues related to the Debtor's machinery and production equipment, as well as assisting the Debtor's customers with custom engineered products.

e.    Thomas Mature, Vice President, Sales:  Mr. Mature has been with the Debtor for over 20 years.  In his capacity as Vice President of Sales, Mr. Mature is responsible for maintaining customer relationships and overseeing the Debtor's sales team.

10.    No payments will be made to the Debtor's senior management during the thirty-day period following the Petition Date except for (i) payment of postpetition salary and benefits and reimbursement of postpetition business expenses consistent with the Debtor's prepetition practices and (ii) to the extent authorized by the Court pursuant to the Wages Motion described below, payment of any accrued but unpaid prepetition salary and benefits and consulting fees and reimbursement of prepetition business expenses, not to exceed $12,475 per individual.  The Debtor estimates that the aggregate amount of all such payments made to senior management during such thirty-day period will be approximately $65,000.00

11.    The Debtor has approximately 82 employees, 55 of whom are unionized and represented by the Hassall Employees Association (the "Union").  The Debtor's collective bargaining agreement with the Union expired in 2011 and negotiations with respect to a new collective bargaining agreement resulted in impasse.  Accordingly, in October 2012, the Debtor unilaterally implemented certain modifications to the terms under which the unionized employees are employed.

12.    As of the Petition Date, the Debtor had estimated assets of approximately $8,532,000 and estimated liabilities of approximately $5,491,000.  Attached hereto as **Exhibit A** is a proposed budget showing the Debtor's estimated cash receipts and disbursements and expected gain or loss for the thirty-day period following the Petition Date.

5

13.    The Debtor as borrower and Sterling National Bank ("Sterling") as prepetition lender are parties to that certain Loan and Security Agreement dated October 18, 2012 (as subsequently amended, the "Prepetition Credit Agreement").  Pursuant to the Prepetition Credit Agreement, the Prepetition Lender provided the Debtor with secured debt financing consisting of a term loan (the "Prepetition Term Loan") in the original principal amount of $1,500,000 and a revolving loan facility (the "Prepetition Revolver") in the maximum amount of $3,500,000.  As of the Petition Date, the outstanding principal balance under the Prepetition Credit Agreement was approximately $3,422,620.81, exclusive of interest, fees, and costs (the "Prepetition Secured Indebtedness") of which approximately $1,232,142.90 is attributable to the Prepetition Term Loan and $2,190,477.91 is attributable to the Prepetition Revolver.

14.    Pursuant to the Prepetition Credit Agreement and the other agreements, documents and instruments executed and delivered in connection therewith (collectively, the "Prepetition Secured Loan Documents"), the Debtor granted to Sterling to secure the prompt payment and performance of the Debtor's obligations under the Prepetition Secured Loan Documents, a lien on and continuing security interest in substantially all of its assets (as more particularly described in the Prepetition Credit Agreement, the "Prepetition Collateral"). The liens and security interests granted by the Debtor to Sterling prior to Petition Date are referred to herein as the "Prepetition Liens."

15.    All of the Debtor's cash, deposit accounts and other cash equivalents, whether original collateral or proceeds of other Prepetition Collateral constitute the Cash Collateral of Sterling.

16.    In addition to the foregoing, as of the Petition Date, the Debtor owed approximately $1,479,226 on an unsecured basis to approximately 165 non-insider trade

6

creditors. This amount does not include a contingent, unliquidated and disputed claim of approximately $306,246 asserted by Westbury Industrial I, LLC, the Debtor's landlord (the "Landlord").

17.    The Debtor has had certain issues concerning its relationship with its landlord. From 2008 through 2012, the Debtor's facilities at 609-1 Cantiague Road, Westbury, New York encountered certain leaks in the roof. These leaks resulted in substantial interruptions in the Debtor's business as at times the Debtor was forced to suspend some of its operations, to hang tarps to collect and funnel rainwater away from the Debtor's sensitive equipment and into barrels on its production floor, and to remove the barrels as they were filled. A dispute arose concerning the Debtor's repeated requests to the Landlord to make repairs to the roof. In January 2013, the Debtor commenced a lawsuit against the Landlord in the New York State Supreme Court (Nassau County), seeking, among other things, injunctive relief requiring the Landlord to repair the roof as well as damages for the business interruptions incurred by the Debtor as a result of such leaks. The Landlord in turn counterclaimed against the Debtor asserting claims for rent, common area maintenance charges, and other amounts allegedly due under the lease. The Debtor disputes the Landlord's claim and asserts that any amounts that it may owe to the Landlord are more than offset by the Debtor's claims against the Landlord for its failure to repair the roof and the consequent damages suffered by the Debtor. The Debtor has engaged in prepetition negotiations with the Landlord and is hopeful that a solution acceptable to both parties can be agreed upon, however, no such resolution has been reached as of the Petition Date.

18.    In addition to its difficulties with the Landlord, the Debtor has also experienced a downturn in its business. The Debtor primarily serves the aerospace, automotive and defense industries and, accordingly, has over the last several years suffered declining revenue as a result

of the general downturn in those industries and the economy as a whole. Most recently, the Debtor has experienced lower than expected sales during the first quarter of 2014, forcing the Debtor to rely heavily on advances under the Prepetition Revolver to pay its operating costs and expenses and precipitating the filing of this Chapter 11 Case.

19.    Prior to commencing this Chapter 11 Case, in July 2013, the Debtor retained the services of Alderman & Company Consulting, LLC ("Alderman Consulting") to solicit interest for the potential sale of some or all of the Debtor's business lines and assets. Alderman Consulting contacted approximately 100 potentially interested parties, approximately 20 of whom signed non-disclosure agreements and were provided access to a virtual data room to conduct preliminary due diligence. Despite robust interest from several potential purchasers, the Debtor was not able to negotiate a definitive transaction agreement on terms acceptable to the Debtor.

20.    The Debtor has filed this Chapter 11 Case in order to take advantage of the "breathing spell" afforded by section 362 of the Bankruptcy Code, and to resume its efforts to sell all or substantially all of its assets to a qualified buyer who can continue the Debtor's business and operations.

## FIRST DAY PLEADINGS

A.  **MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO SECTIONS 105, 361, 362 363 AND 364 OF THE UNITED STATES BANKRUPTCY CODE, RULES 2002, 4001, 6003 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND RULE 4001-5 OF THE LOCAL BANKRUPTCY RULES FOR THE EASTERN DISTRICT OF NEW YORK: (I) AUTHORIZING THE DEBTOR TO OBTAIN SECURED POSTPETITION FINANCING AND USE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; (III) SCHEDULING A FINAL HEARING AND (IV) GRANTING CERTAIN RELATED RELIEF (the "DIP Motion")**

21.    The Debtor requests that the Court grant the following relief as provided in the proposed order submitted with the DIP Motion:

   a.    authorizing and approving, pursuant to section 364(c) of the Bankruptcy Code, the Debtor to obtain the DIP Financing from Sterling National Bank ("Sterling") pursuant to the terms and conditions of (a) the DIP Orders, (b) the DIP Loan Documents, including approval of the fees and interest agreed upon in the DIP Loan Documents and (c) the budgets approved pursuant to the DIP Orders (each a "Budget");

   b.    authorizing and approving, pursuant to section 363 of the Bankruptcy Code, the Debtor's use of Sterling's Cash Collateral on the terms provided in the DIP Motion;

   c.    granting Sterling adequate protection, including, without limitation, adequate protection against the diminution in the value or amount of the Prepetition Collateral in the form of Replacement Liens and a superpriority administrative expense claim under section 507(b) of the Bankruptcy Code, such Replacement Liens and section 507(b) superpriority administrative expense claim to be subject only to payment of the Carve-Out and the DIP Financing Superpriority Claims (as defined in the DIP Orders), as more particularly set forth in the DIP Motion;

   d.    authorizing and directing the Debtor to use Cash Collateral or proceeds of the DIP Financing in accordance with the Budget and the terms of the DIP Orders;

   e.    scheduling a final hearing (the "Final Hearing") to consider the entry of the Final DIP Order; and

   f.    granting such further and related relief as the Court deems just and equitable.

2302963.5

<u>The Debtor's Need for Postpetition Financing</u>

22.    The DIP Motion is brought on an emergency basis in light of the immediate and irreparable harm that will be suffered by the Debtor's estate if the proposed DIP Financing is not approved.

23.    Pursuant to the terms of the Prepetition Credit Agreement, all of the Debtor's accounts receivable are paid into a blocked account at Sterling National Bank and applied against the outstanding balance on the Prepetition Revolver.  Prior to commencing this Chapter 11 Case, the Debtor would make periodic draws upon the Prepetition Revolver to fund its payroll and operations.  Accordingly, without the use of Cash Collateral and the DIP Financing proposed in this Motion, the Debtor will not have the funds necessary to pay postpetition payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and properties.

<u>The Debtor's Efforts to Obtain Postpetition Financing</u>

24.    Prior to the Petition Date, when it became clear that the Debtor would need to file this Chapter 11 Case and would require postpetition financing, the Debtor solicited interest from other parties who were viewed as qualified to provide the Debtor with fully committed debtor-in-possession financing. Two potential lenders, Amerisource Financial and North Mill Capital expressed interest in providing the Debtor with funding on a postpetition, secured basis, however neither potential lender was capable of completing their required pre-funding diligence in the short timeframe required.

25.    In the end, the accelerated time frame in which the Debtor required the funding, the unwillingness of Sterling to consent to having its liens primed or treated *pari passu* with a

2302963.5

new postpetition lender, the inability of the Debtor to endure a costly and uncertain priming fight, and the Debtor's inability to pay significant commitment fees to potential new lenders combined to make the DIP Financing the Debtors best, and only real option for postpetition funding.

The Proposed Postpetition Financing

26.     After extensive good faith, arm's-length negotiations, Sterling agreed to provide the DIP Financing.   As set forth in the Assumption Agreement, Amendment to Loan and Security Agreement and Amendment to Other Loan Documents (the "Assumption Agreement" and, together with the Prepetition Credit Agreement and the other Prepetition Secured Loan Documents ratified and amended thereby, the "DIP Loan Documents"), Sterling has agreed to consent to the Debtor's use of Cash Collateral and to provide up to $5,000,000 in DIP Financing, subject to the terms and conditions of the DIP Orders and the DIP Loan Documents and further subject to availability and the borrowing base provided in the DIP Loan Documents.

27.     The Debtor's obligations under the DIP Financing (the "DIP Indebtedness") will be secured by a senior security interest in and lien upon all postpetition property of the Debtor, whether existing on the Petition Date or thereafter acquired (the "Postpetition Collateral," and together with the Prepetition Collateral, the "Collateral") (excluding proceeds from avoidance actions under chapter 5 of the Bankruptcy Code), subject only to the payment of the Carve-Out and any validly existing and perfected liens as of the Petition Date (excluding the Prepetition Liens) (the "Postpetition Liens").

28.     The Debtor estimates that the proceeds of the DIP Financing will be sufficient to (a) support its general working capital needs, (b) to fund the costs of administering this Chapter 11 Case and (c) pay all fees and expenses provided under the DIP Loan Documents and

authorized by the Court. The following chart summarizes the significant terms of the DIP Financing and the Interim DIP Order:

| Parties | Borrower - John Hassall, Inc. <br> Lender - Sterling National Bank |
|---|---|
| **Maturity** | November 1, 2014 |
| **Purpose** | The DIP Financing shall be available solely for the purposes set forth in the Budget and the DIP Orders |
| **Interest Rates** | Revolving Loans under the DIP Financing will accrue interest at a rate equal to the Wall Street Journal Prime Rate plus two (2%) percent. The Term Loan under the DIP Financing will accrue interest at a rate equal to the Wall Street Journal Prime Rate plus two and one quarter (2.25%) percent. |
| **DIP Commitments** | Total aggregate loans of up to $5,000,000 pursuant to the terms and conditions of the DIP Orders and the DIP Loan Documents and subject to availability and the borrowing base provided in the DIP Loan Documents. |
| **Funding Conditions** | Sterling's obligation to fund the DIP Financing is conditioned upon and subject to execution of the Assumption Agreement, Sterling's approval of an Approved Budget, entry of the Interim DIP Order and payment of Sterling's amendment and legal fees. |
| **Fees** | $10,000 Amendment and Waiver Fee (paid prepetition) <br> Reasonable and Customary Extension Fee (if necessary) <br> Reimbursement of Professional Fees |
| **Liens and Priorities of DIP Obligations** | The DIP Indebtedness will be secured by a senior security interest in and lien upon all postpetition property of the Debtor, whether existing on the Petition Date or thereafter acquired (excluding any proceeds from avoidance actions under chapter 5 of the Bankruptcy Code), subject only to the payment of the Carve-Out and any validly existing and perfected liens as of the Petition Date (excluding the Prepetition Liens). <br> The Debtor's obligations under the DIP Financing will constitute superpriority administrative expenses in the Debtor's Chapter 11 Case. |

2302963.5

| | |
|---|---|
| **Carve-Out** | The Carve-Out applies to United States Trustee fees and applicable interest, fees and expenses incurred by counsel to the Debtor and counsel to the Committee prior to the occurrence of an Event of Default and fees and expenses of the Debtor's counsel and counsel to the Committee incurred after an Event of Default, up to $50,000. |
| **Adequate Protection** | Sterling, whose Cash Collateral will be authorized for use by the Debtor, will be entitled to receive as adequate protection a lien and security interest in and upon the Collateral and all proceeds thereof, subject only to payment of the Carve-Out, any validly existing and perfected liens as of the Petition Date (excluding the Prepetition Liens) and the Postpetition Liens; |
| **Affirmative Covenants** | Among other things, to (i) deliver borrowing base certificates; (ii) deliver periodic updates of the cash flow forecast; (iii) deliver financial statements; and (iv) maintain the Debtor's existing cash management system. |
| **Events of Default** | (a) failure to pay any installment of principal or interest when due; (b) failure to maintain satisfactory collateral value; (c) any false or materially misleading statement, representation or warranty of the Debtor; (d) any levy, lien, seizure, attachment or execution upon the Collateral which is not cured within ten (10) days of the Debtor's receiving notice thereof; (e) any of the DIP Loan Documents shall cease to be in full force and effect; (f) Sterling's security interest shall cease to be a first priority security interest; (g) any award, judgment or decree for the payment of money in excess of $50,000 is entered against the Debtor and is not stayed within ten (10) days; (h) the Debtor liquidates, dissolves, terminates or suspends it business operations or otherwise fails to operate in the ordinary course; (i) the payment of any prepetition indebtedness except otherwise in accordance with any DIP Order, without prior consent of the Bank; (j) the occurrence of a Budget Default (as defined in the Assumption Agreement); (k) the Chapter 11 Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code; (l) the appointment of a chapter 11 trustee or an examiner with enlarged powers; (m) the grant of relief from the automatic stay to permit enforcement of rights by the Debtor's landlord, Westbury Industrial 1, LLC, or by any other party with respect to any debt in excess of or Lien having an aggregate value in excess of $25,000; (n) entry of an order authorizing or approving the rejection of the Borrower's lease with Westbury Industrial 1, LLC; (o) any reversal, revocation or modification without the consent of the Bank of any DIP Order or any other order of the Bankruptcy Court having a material adverse |

2302963.5

| | impact to the Bank with respect to the Loan Documents; (p) the filing of a plan of reorganization in the Borrower's Case that does not provide for payment in full in cash of the Obligations under the Loan Documents on the effective date of such plan without the written consent of the Bank; and (q) the grant of any superpriority administrative expense claim or any lien which is *pari passu* with or senior to those of the Bank under the Original Loan Documents, or the authorization to use cash collateral without the consent of the Bank. |
|---|---|
| **Waivers and Consents** | Estate Claims - The Debtor stipulates as to the validity of the Prepetition Liens and Prepetition Secured Indebtedness and releases all claims, defenses or causes of action with respect thereto. |
| | Section 506(c) – Subject to the Carve-Out, no expenses of administration of the Debtor's Chapter 11 Case or any future proceedings shall be recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of Sterling. |

29.     The Debtor believes that the DIP Financing is the best financing available to the Debtor at this time.  Despite its best efforts and discussions with potential lenders, the Debtor was simply unable to obtain unsecured or junior secured financing.

30.     The Debtor's decision to accept the terms of the DIP Financing is the culmination of a search to procure the best financing available under the circumstances.  Borrowing under the terms of the DIP Financing is clearly the best option available to the Debtor and entry of the DIP Orders is in the best interests of the Debtor, its estate and stakeholders.

31.     The DIP Financing will provide immediate access to capital to pay vendors and employees, establish the prudent cash balances for a business of the Debtor's size and stabilize operations.  The proceeds from the DIP Financing will be used to satisfy working capital requirements, and fund restructuring costs and capital expenditures.

32.     Failure to obtain the DIP Financing would gravely harm the Debtor and its stakeholders.  Without access to the DIP Financing, the Debtor could potentially be forced to

2302963.5

cease operations and liquidate its business piecemeal to the detriment of all parties in interest. The Debtor needs to obtain immediate access to liquidity under the DIP Financing in order to, among other things, continue the operation of its business, maintain business relationships with vendors and customers, make payroll and capital expenditures, and satisfy other working capital and operational needs. Without immediate financing, vendors, customers and other stakeholders will lose confidence in the Debtor, thereby causing irreparable harm to the Debtor's business and operations. Indeed, the Debtor has already begun to suffer disruptions in its supply chain due to its lack of liquidity, a problem that will be exacerbated without immediate access to the DIP Financing. Funding these expenditures is necessary to the Debtor's ability to preserve and maintain its going-concern value for the benefit of all parties in interest.

33.     The DIP Financing provides the Debtor the liquidity it needs to operate its business during this Chapter 11 Case, thus permitting the Debtor to effectively sell its assets. After thorough analysis by the Debtor and its advisors, the Debtor has concluded that the terms of the DIP Financing are reasonable and appropriate under the circumstances. The Debtor further believes that the adequate protection proposed in the DIP Motion and DIP Orders is fair and reasonable and is sufficient to satisfy the requirements of section 363(c) of the Bankruptcy Code.

**B.      MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING (A) MAINTENANCE OF EXISTING BANK ACCOUNTS, (B) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEMS AND (C) CONTINUED USE OF EXISTING BUSINESS FORMS (the "Cash Management Motion")**

34.     The Debtor seeks entry of interim and final orders authorizing, but not directing it (a) to maintain its existing bank accounts, (b) to continue to use its existing cash management system and (c) to continue to use existing business forms.

2302963.5

35.    Prior to the Petition Date, the Debtor, in the ordinary course of its business, maintained several bank accounts (collectively, the "Bank Accounts") which function as an integrated cash management system (the "Cash Management System"). The Debtor's existing Bank Accounts and their respective roles within the Cash Management System are as follows:

a)    Operating Account. The Debtor maintains an operating account (account No. XXXXXX1558, the "Operating Account") at Sterling National Bank ("Sterling"). The Operating Account is funded with money borrowed from Sterling under the Debtor's secured revolving credit facility. The Debtor uses the funds in the Operating Account to fund its day to day operations and expenses, as well as certain elective employee payroll deductions. The funds in the Operating Account are also transferred as needed to fund the Payroll Account (defined below).

b)    Payroll Account. The Debtor maintains a payroll account (account No. XXXXXX5827, the "Payroll Account") at Sterling. Funds in the Payroll Account are withdrawn by ADP, the Debtor's payroll service provider, who then uses the funds to pay the Debtor's employees together with related payroll taxes and certain garnishments and other withholding.

c)    Lockbox Account. Sterling maintains in its own name a lockbox account (account No. X5304), the "Lockbox Account"). All of the Debtor's accounts receivable are remitted to the Lockbox Account. Upon receipt of funds into the Lockbox Account, Sterling credits such funds to the Debtor's secured revolving credit facility, creating additional borrowing availability thereunder which can then be used to fund the Operating Account.

36.    The Cash Management System enables the Debtor and Sterling to monitor collection and disbursement of funds and to facilitate the effective collection, disbursement, and movement of cash. Additionally, pursuant to the terms of its loan agreement with Sterling, the Debtor is required to maintain the Lockbox Account for the purposes of collecting its receivables.

37.    Without the relief requested in the Cash Management Motion, the Debtor would be required to open new, separate accounts as a debtor in possession, which would have the effect of disrupting its existing Cash Management System. Not only would the Debtor be forced

16

to devote valuable time and resources to opening new accounts and implementing a new cash management system, but critical funds may not be collected on account of accounts receivable. Moreover, the opening of new accounts would certainly increase the Debtor's operating costs, thereby negatively impacting the Debtor's cash flow and would constitute an event of default under the loan agreement with Sterling.

38.    The Debtor will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred.  In addition, the Debtor will instruct its banks to add the designation "Debtor in Possession" or "DIP" to current and any future Bank Accounts with each such bank, and will treat the Bank Accounts for all purposes as accounts of the Debtor as debtor in possession, and will maintain records that recognize the distinction between pre-petition and post-petition transfers.

39.    As of the Petition Date, the Debtor has instructed Sterling to stop payment on all prepetition checks with the exception of checks relating to certain prepetition debts that the Debtor is seeking the authority to pay pursuant to several other motions filed contemporaneously herewith.

40.    The Debtor's existing Cash Management System is essential to the ordinary operation of the Debtor's business.  The Debtor submits that the cost and expense of changing the Bank Accounts and creating a new cash management system would not only force the Debtor to incur unnecessary costs and expenses, but would impair the operation of the Debtor's business and constitute a default under the Debtor's loan agreement with Sterling.

41.    Indeed, forcing the Debtor to employ a new cash management system could cause confusion, disrupt payroll and collections, introduce inefficiency at a time when efficiency is

most critical, and place additional strain on the Debtor's relationships with vendors and suppliers.

42.    The Debtor seeks a waiver of the Operating Guideline's requirement that the Bank Accounts be closed and new postpetition bank accounts be opened.  If enforced in this Chapter 11 Case, this requirement would cause undue disruption to the Debtor's continued operations and would impair its efforts to maximize value through this chapter 11 process. Dismantling the Debtor's cash management system would likely disrupt the Debtor's relationships with its key stakeholders and may hinder its abilities to maintain operations pending its reorganization.

43.    Maintenance of the Bank Accounts would greatly facilitate the Debtor's transition to post-petition operations and preserve the value of the Debtor.  To avoid delays in payment of debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtor should be permitted to continue to maintain the Bank Accounts.  Closing the Bank Accounts and transferring the funds in those accounts to newly created postpetition accounts would be disruptive and time consuming.  Moreover, requiring the Debtor to close or alter the Bank Accounts would greatly complicate and disrupt the cash management system currently in place, likely to the detriment of the Debtor's estate and creditors.

44.    Subject to a prohibition against honoring prepetition checks without specific authorization from this Court, the Debtor requests that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtor be authorized to maintain and continue the use of these accounts in the same manner and with the same account numbers, styles, and document forms as those employed during the prepetition period.

2302963.5

45.    If the relief requested herein is granted, the Debtor will not pay, and the banks where the Bank Accounts are maintained will be directed not to pay, any debts incurred before the Petition Date, other than as specifically authorized by this Court.

46.    To minimize expense to its estate, the Debtor also requests authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, etc.) and checks existing as of the Petition Date, without reference to its status as debtor in possession.

47.    Because of the nature of the Debtor's business and the notice of commencement of this Chapter 11 Case that will be sent to all of the Debtor's stakeholders and creditors, parties doing business with the Debtor likely will be made aware of the Debtor's status as s chapter 11 debtor in possession.  Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's business operations.  For these reasons, the Debtor requests authority to use its existing checks and business forms without placing the label "Debtor in Possession" on such checks or forms.

48.    The Debtor maintains current and accurate accounting records of daily cash transactions and submits that maintenance of its Cash Management System will prevent undue disruption to its business and operations, while protecting its cash for the benefit of its estate.

49.    The basic structure of the Debtor's Cash Management System constitutes the Debtor's ordinary, usual, and essential business practice.  The Cash Management System is similar to those commonly employed by enterprises comparable in size and complexity to the Debtor.  The widespread use of such systems is attributable to the numerous benefits they provide, including the ability: (a) to tightly control corporate funds; (b) to ensure cash availability; and (c) to reduce administrative expenses by facilitating the movement and

19

concentration of funds and the development of timely and accurate account balance and presentment information.

50.     The Debtor submits that "cause" exists to waive the investment and deposit restrictions of section 345(b) of the Bankruptcy Code to the extent that the Debtor's Bank Accounts and Cash Management System do not comply therewith.  Sterling National Bank, with whom the Debtor maintains its Bank Accounts, is a financially stable banking institution and is FDIC insured (up to the applicable limit per account).  All such deposits and investments are prudent and designed to best accommodate the Debtor's cash management needs.  Given the relative security of the Debtor's Cash Management System, the Debtor submits that cause exists to grant a waiver of the requirements of section 345(b) of the Bankruptcy Code.

51.     The Debtor's Cash Management System constitutes a customary and essential business practice that was created and implemented by the Debtor's management in the exercise of its business judgment.  Maintaining the Cash Management System without disruption is critical to the continued operation of the Debtor's business and to the preservation of the value of the Debtor's estate.  It is therefore appropriate and consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the continued use of the Cash Management System in its current form.

**C.     MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) PAY PREPETITION COMPENSATION AND REIMBURSABLE EMPLOYEE BENEFITS, (B) PAY AND HONOR EMPLOYEE MEDICAL AND OTHER BENEFITS AND (C) CONTINUE EMPLOYEE BENEFIT PROGRAMS (the "<u>Wages and Employee Benefits Motion</u>")**

52.     The Debtor has eighty-two active employees (the "<u>Employees</u>"), one of which is part-time.  Fifty-five Employees are hourly wage earners, while the remaining twenty-seven are

salaried personnel. Fifty-five Employees are unionized and are represented by the Hassall Employees Association (the "Union").

53.    The Employees perform a variety of critical functions for the Debtor including, without limitation, manufacturing, finance, human resources, customer service, management, marketing, sales, maintenance, shipping, and other tasks.  The Employees' skills and their knowledge and understanding of the Debtor's operations, customer relations, and infrastructure are essential to the effective prosecution of this Chapter 11 Case and the marketing and sale process contemplated herein.

54.    The vast majority of the Employees rely exclusively on the compensation and benefits they receive from the Debtor to provide for their daily living expenses and these Employees would be exposed to significant financial difficulties if the Debtor were not permitted to continue paying and providing such compensation and benefits in the ordinary course of its business.

55.    To minimize the personal hardship that the Employees would suffer if prepetition Employee-related obligations are not paid when due or as expected, and to maintain morale and stability in the Debtor's workforce during this critical time, the Debtor, by the Wages Motion, seeks authorization to pay and honor, in its sole discretion, certain prepetition claims for, among other amounts, wages, salaries, bonuses, commissions and other compensation and reimbursements, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' shares of insurance premiums, taxes and 401(k) contributions), health insurance, worker's compensation benefits, vacation time, leaves of absence, life insurance, and disability coverage and all other benefits that the Debtor has historically provided to its Employees in the ordinary course of business (collectively, and as described in further detail

2302963.5

below, the "Employee Wages and Benefits"), to pay all costs incident to the foregoing, and to continue to pay and provide the Employee Wages and Benefits in the ordinary course of business. Out of an abundance of caution, the Debtor requests the right to modify, change and discontinue any of its Employee Wages and Benefits and to implement new programs, policies and benefits, in the ordinary course of business during the pendency of this Chapter 11 Case, in its sole discretion and without the need for further Court approval, subject to applicable law.

Unpaid Compensation

56.    The Debtor's unionized Employees are paid weekly in arrears and all other Employees are paid bi-weekly in arrears. The Debtor utilizes the services of ADP to process and pay its payroll obligations to Employees. The Debtor funds a payroll account prior to each pay date with funds sufficient to pay all payroll obligations. On the pay date, ADP withdraws funds from the Debtor's payroll account, processes all Employee withholdings and other deductions, and pays Employees via direct deposit and/or paper checks. The Debtor is current with respect to its payroll obligations owed to Employees and the next scheduled pay date is May 2, 2014. Based upon historical data, the average weekly payroll for the unionized Employees is approximately $53,000 and the average bi-weekly payroll for the Debtor's other Employees is approximately $72,000. The Debtor estimates that approximately $125,000 in prepetition wages, salaries, overtime pay, commissions and other cash compensation has accrued in the ordinary course prior to the Petition Date and remains unpaid (collectively, the "Unpaid Compensation"). Items of Unpaid Compensation were due and owing on the Petition Date because, among other things: this Chapter 11 Case was filed during the Debtor's regular payroll periods; some checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition

Date; and Employees have not yet been paid all their salaries and wages for services performed prior to the Petition Date because the Debtor pays payroll in arrears.

57.    The Debtor believes that it does not owe any Employee a prepetition amount in excess of the $12,475 cap on priority claim amounts imposed by section 507(a)(4) of the Bankruptcy Code.  Accordingly, the Debtor is not seeking authority to pay any amount over the $12,475 cap to any Employee.

Other Compensation and Reimbursable Expenses

58.    The Debtor offers its Employees other forms of compensation, including vacation pay, paid holidays and other earned time off, and reimbursement of certain business expenses. These forms of compensation and reimbursement are usual, customary and necessary if the Debtor is to retain qualified Employees to operate its business.

59.    The Debtor provides vacation time to its Employees, the amount and accrual rate of which is based generally on an Employee's length of service and level within the Debtor's organization ("Vacation Time").  Ordinarily, when an Employee elects to take Vacation Time, that Employee is paid his or her regular hourly or salaried rate.  The Debtor estimates that its Employees have accrued approximately $96,700 of unused Vacation Time as of the Petition Date.  This amount, however, is not a current cash payment obligation as Employees are only entitled to payment for accrued and unused Vacation Time as they take vacation or in the event that the Employee leaves the Debtor's employment. Any such payout will be subject to the cap imposed by section 507(a)(4) of the Bankruptcy Code.

60.    The Debtor also allows its Employees to take certain other leaves of absence for personal reasons, many of which are required by law ("Leaves of Absence").  Leaves of Absence may include sick leaves, personal leaves, family medical leaves, pregnancy, adoption and foster

care leaves, and military leaves. Each applicable policy contains specific terms governing whether Employees are entitled to compensation for any Leaves of Absence.

61.    The Debtor requests that it be authorized, but not directed, to continue to honor its Vacation Time and Leaves of Absence policies in the ordinary course of business and to honor and pay any prepetition amounts related thereto. Moreover, the Debtor anticipates that its Employees will utilize any accrued Vacation Time and Leaves of Absence in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtor's normal payroll obligations.

62.    Prior to the Petition Date, and in the ordinary course of its business, the Debtor reimbursed Employees for certain reasonable and customary expenses incurred on behalf of the Debtor in the scope of their employment (collectively, the "Business Expenses"). The Business Expenses, include, among other things, (a) business-related travel expenses; (b) business development expenses; (c) telephone expenses that are paid by Employees; and (d) other miscellaneous business expenses. Most Business Expenses are reimbursed directly to the Employees following the date the expenses are incurred either as supplemental payroll payments or by check.

63.    As of the Petition Date, the Debtor estimates that approximately $500 in pending requests for reimbursement from Employees are outstanding. However, it is possible that certain Employees may have incurred prepetition Business Expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtor after the Petition Date.

64.    All of the Business Expenses are incurred on the Debtor's behalf and with the understanding that they will be reimbursed. Accordingly, to avoid harming Employees who may

have incurred Business Expenses, the Debtor requests the authority, to be exercised in its sole discretion, to: (a) continue paying Business Expenses in accordance with prepetition practices; (b) modify its prepetition policies relating thereto as it deems appropriate; and (c) pay all Business Expenses that relate to the prepetition period.

Health Benefit Plans

65.    The Debtor provides certain Employees and their eligible dependents with group insurance coverage for medical care, dental care, disability and life insurance (collectively, the "Health Benefit Plans").

66.    The Debtor sponsors a high-deductible medical benefits plan for its eligible Employees and a traditional medical benefits plan for its Executive Employees, both of which are provided through Oxford / UHP Health Insurance, Inc.  Approximately 50 Employees participate in the high-deductible plan and approximately five executive Employees are covered under the traditional plan.  The Debtor pays Oxford approximately $61,441 per month in connection with the medical benefits plans, approximately 60% of which is paid by the Debtor and the remainder of which is paid by participating Employees through voluntary payroll deductions.  As of the Petition Date, the Debtor estimates that it owes Oxford approximately $82,000 related to prepetition amounts due.

67.    The Debtor offers a dental benefits plan for its eligible Employees through Met Life and approximately 28 Employees participate in the dental plan.  The cost of the dental plan is paid for entirely by participating Employees through voluntary payroll deductions.

68.    The Debtor sponsors long-term disability benefits for its eligible executive Employees through Northwestern Mutual and approximately 9 Employees receive such benefits.

2302963.5

The Debtor pays to Northwestern Mutual the full costs of providing long-term disability coverage which is, on average, approximately $619 per month.

69.    The Debtor offers basic life insurance for its eligible Employees through Met Life and approximately 4 Employees receive such benefits. The cost of the life insurance is paid for entirely by participating Employees through voluntary payroll deductions.

70.    The Debtor offers eligible Employees the ability to participate in additional, voluntary insurance programs offered through AFLAC. These programs are paid for entirely by participating Employees through voluntary payroll deductions.

71.    The Debtor requests authorization, in its sole discretion, to: (a) continue paying costs associated with the Health Benefit Plans in accordance with prepetition practices; (b) modify its prepetition policies relating thereto as it deems appropriate; and (c) pay all costs associated with the Health Benefit Plans that relate to the prepetition period.

401(k) Plan

72.    The Debtor offers certain Employees the opportunity to participate in a retirement plan qualified under section 401(k) of title 26 of the United States Code (the "401(k) Plan"). The 401(k) Plan is administered by John Hancock. Under the terms of the 401(k) Plan, eligible Employees may elect to contribute a portion of their salary or wages to the 401(k) Plan via automatic, pre-tax salary deductions.

Workers' Compensation

73.    The Debtor provides workers' compensation benefits ("Workers' Compensation Benefits") to all Employees. These benefits are covered primarily under the Debtor's workers' compensation insurance programs, which are insured and administered by Chubb. On average, the Debtor pays approximately $6,505.25 per month for such insurance.

2302963.5

74.    Failure to maintain this insurance could result in the institution of administrative or legal proceedings against the Debtor and its officers and directors. The Debtor finances the workers' compensation premiums pursuant to a premium finance agreement with AFCO Credit Corporation. By separate motion filed contemporaneously herewith the Debtor is seeking authority to honor its obligations to AFCO so as to maintain its workers' compensation coverage.

75.    The Debtor seeks authority to continue paying and/or contesting in good faith, as appropriate in the Debtor's business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of such claims and wage loss makeup obligations, as they become due in the ordinary course of the Debtor's business.

Executive Benefits

76.    In addition to the benefits described above, the Debtor offers a limited number of its executive Employees certain other benefits including cell phone reimbursement, the use of company cars and/or a car allowance (the "Additional Benefits"). The cost to the Debtor of providing the Additional Benefits is approximately $2,928. per month.

77.    The Debtor believes that providing the Additional Benefits is necessary to allow the executive Employees to continue to perform their duties on behalf of the Debtor and is further important to maintaining morale and retaining the services of its executive team. Accordingly, by this Motion, the Debtor seeks authorization, but not direction, to continue to provide the Additional Benefits.

Taxes and Other Withholdings

78.    During each applicable pay period, the Debtor, or ADP on the Debtor's behalf, routinely withholds certain amounts from Employees' paychecks that are required to be

transmitted to third parties. Examples of such withholding include child support payments and other wage garnishments (which are withheld and paid by ADP), and other pre-tax and after-tax deductions payable pursuant to certain of the benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums, 401(k) contributions, and other miscellaneous deductions which are withheld and paid by the Debtor) (collectively, the "Deductions").

79.     The Debtor and ADP forward the Deductions to the appropriate third-party recipients. Due to the commencement of this Chapter 11 Case however, certain Deductions may not have been forwarded to the appropriate third-party recipients prior to the Petition Date. The Debtor estimates that, as of the Petition Date, all of the Deductions have been forwarded to the appropriate third-party recipients with the exception of those Deductions relating to the upcoming May 2, 2014 payroll.

80.     Further, the Debtor is required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state or local taxing authority (collectively the "Withheld Amounts"). The Debtor must match from its own funds Social Security and Medicare taxes (collectively, the "Employer Payroll Taxes" and, together with the Withheld Amounts, the "Payroll Taxes"). The Debtor believes that, as of the Petition Date, all Payroll Taxes have been forwarded to the appropriate taxing authorities with the exception of those Payroll Taxes relating to the upcoming May 2, 2014 payroll.

81.     The Debtor believes that the Deductions and Payroll Taxes, to the extent that they remain in the Debtor's possession, constitute monies held in trust and therefore are not property of the Debtor's bankruptcy estate. Accordingly, the Debtor seeks authorization, but not

28

direction, to forward any unpaid Deductions and Payroll Taxes to ADP for distribution to the appropriate third-party recipients and taxing authorities and to continue to forward the Deductions and Payroll Taxes on a post-petition basis, in the ordinary course of business, as routinely done prior to the Petition Date.

82.     In order to retain its Employees and maintain morale, the Debtor must have authority to pay or otherwise satisfy the Employee Wages and Benefits as summarized above. The amounts to be paid to Employees pursuant to this Motion are reasonable compared with the importance and necessity of the Employees and the harm the Debtor's business would likely suffer if these amounts are not paid.

83.     The Debtor's books and records indicate that in no instance should the amount owing to any Employee on account of the Employee Wages and Benefits as of the Petition Date exceed the sum of $12,475, which amount is allowable as a priority claim under sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.  Moreover, the Debtor only seeks authority to make payments to Employees up to the combined statutory maximum of $12,475 on account of wages and compensation allowed as a priority claim under section 507(a)(4) and contributions to employee benefit plans allowed as a priority claim under section 507(a)(5).

84.     As part of the requested relief, the Debtor also seeks authority to pay the Deductions and Payroll Taxes to ADP for distribution to the appropriate third-party recipients and taxing authorities.  Indeed, certain of these amounts are not property of the Debtor's estates because they have been withheld from Employee's paychecks on another party's behalf.  The Deductions principally represent Employee earnings which Employees or, in the case of garnishments, judicial authorities, have designated for deduction from Employee paychecks and

2302963.5

payment to third-party recipients. The failure to pay the Deductions could result in hardship to certain Employees.

85.     Based upon the foregoing, the Debtor respectfully requests that the Court enter an Order authorizing the Debtor to pay or otherwise satisfy, in the ordinary course of business, the Employee Wages and Benefits. Such relief is justified because the failure to pay any such amounts will likely disrupt the services that the Employees provide to the Debtor and ultimately, the Debtor's ability to reorganize its financial affairs.

**D.    MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTOR TO (A) HONOR PREPETITION INSURANCE PREMIUM FINANCING AGREEMENT AND (B) ENTER INTO NEW PREMIUM FINANCING AGREEMENTS IN THE ORDINARY COURSE OF BUSINESS (the "Insurance Premium Financing Motion")**

86.     The Debtor hereby seeks authority, but not direction, (a) to honor its obligations (the "Financing Obligations") with respect to prepetition insurance premium financing agreements (the "Agreements") with AFCO Credit Corporation ("AFCO") and Euler Hermes North America ("Euler Hermes," and together with AFCO, the "Premium Finance Companies") (b) to renew the Agreements or enter into similar replacement agreements in the ordinary course of business, without need for further authority or approval from the Court and (c) to pay any prepetition premiums (the "Premium Obligations") that may be owed with respect to its other Insurance Policies (defined below).

87.     In the ordinary course of the Debtor's business, the Debtor maintains numerous insurance policies providing coverage for, among other things, general liability, aircraft products liability, automobile liability, employer's liability, crime, errors and omissions, property, director and officer liability, and workers compensation as well as umbrella coverage and accounts receivable insurance (collectively, the "Insurance Policies"). The Insurance Policies are essential

to the preservation of the Debtor's business, property and assets and, in many cases, such coverages are required by various regulations, laws and contracts that govern the Debtor's commercial activity.

88.     The aggregate cost of the annual premiums for the Debtor's Insurance Policies is approximately $201,776.21. It is not always economically advantageous for the Debtor to pay the premiums on all of the Insurance Policies on a lump-sum basis. Accordingly, in the ordinary course of the Debtor's business, the Debtor finances the premiums on some of its Insurance Policies by entering into premium finance agreements with premium finance companies such as AFCO and Euler Hermes.

89.     Pursuant to the Debtor's Agreement with AFCO, the Debtor financed the premiums for several of its Insurance Policies. Prior to the Petition Date, the Debtor made a cash down payment to AFCO in the amount of $35,277.00 and financed the remaining $141,109.21 of premiums. In exchange for the financing, the Debtor agreed to pay eight monthly installment payments including a total finance charge of $2,502.71, representing an annual interest rate of 3.850%. In addition, the Debtor granted AFCO a security interest in return premiums and certain loss payments to secure its payment obligations.

90.     Pursuant to the Debtor's Agreement with Euler Hermes, the Debtor financed the premiums for its accounts receivable insurance. Prior to the Petition Date, the Debtor made a cash down payment to Euler Hermes in the amount of $6,347.50, and financed the remaining $19,042.50 of premiums. In exchange for the financing, the Debtor agreed to pay three quarterly installment payments, including a total finance charge of $758.22, representing an annual interest rate of 8%.

2302963.5

91.     If the Debtor is not able to pay the Financing Obligations, the Premium Finance Companies may seek relief from the automatic stay to terminate the Insurance Policies in order to recoup their losses.  The Debtor would then be required to obtain replacement insurance on an expedited basis and at tremendous cost to the Debtor's estate.  If the Debtor was required to obtain replacement insurance and pay a lump-sum premium in advance, this payment would likely be greater than what the Debtor currently pays.  Even if the Premium Finance Companies were not permitted to terminate the Insurance Policies, any interruption of payment would have a severe, adverse effect on the Debtor's ability to obtain new policies or finance premiums in the future.  In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtor's cash flow and estate by financing the insurance premiums, the Debtor believes it is in the best interests of its estate to authorize the Debtor to honor its Financing Obligations.   Any other alternative would likely require considerable additional cash expenditures and would be detrimental to the Debtor's reorganization efforts.

92.     In addition, because the Agreements may expire during the course of this Chapter 11 Case, the Debtor seeks authority to renew the Agreements or to enter into similar replacement agreements in the ordinary course of its business, without further Court approval.  The Debtor will need to continue its insurance coverage throughout the entire duration of this Chapter 11 Case.  The Debtor respectfully submits that renewal of the Agreements falls squarely within its ordinary course of business, and, but for the constraints of section 364 of the Bankruptcy Code, the Debtor would not need the Court's prior approval to renew the Agreements.  To reduce the administrative burden, as well as the expense of operating as debtor in possession, the Debtor seeks the Court's authority now to renew the Agreements or enter into new similar agreements if and when necessary.

2302963.5

93.     The maintenance of the Debtor's insurance coverage is of the utmost importance. Indeed, the laws of the State of New York and other jurisdictions in which the Debtor operates mandate that the Debtor maintains certain insurance coverage such as workers' compensation insurance coverage and automobile liability insurance.  In light of the importance of maintaining insurance coverage with respect to its business activities and preserving the Debtor's liquidity by financing the insurance premiums, the Debtor believes it is in the best interests of its estate to honor the Financing Obligations, and to renew the Agreements or enter into similar agreements, as necessary.

**E.      MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (A) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING OR DISCONTINUING SERVICES TO AND/OR DISCRIMINATING AGAINST THE DEBTOR ON ACCOUNT OF PREPETITION AMOUNTS DUE, (B) DETERMINING THAT THE DEBTOR'S UTILITIES ARE ADEQUATELY ASSURED OF FUTURE PAYMENT, (C) AUTHORIZING THE DEBTOR TO PAY ADEQUATE ASSURANCE DEPOSITS AND (D) ESTABLISHING PROCEDURES FOR OBJECTING OR REQUESTING ADDITIONAL ASSURANCE OF PAYMENT (the "Utilities Motion")**

94.     The Debtor seeks entry of interim and final orders (a) prohibiting utility companies from altering, refusing or discontinuing services to and/or discriminating against the Debtor on account of prepetition amounts due, (b) determining that the Debtor's utility companies are adequately assured of future payment, (c) authorizing the Debtor to make adequate assurance deposits and (d) establishing procedures for determining requests for additional assurance of payment.

95.     The Debtor currently uses electricity, natural gas, telecommunications, and other similar services provided by the Utility Companies.  Uninterrupted service from the Utility Companies is essential to the Debtor's continued operation and successful restructuring.  The Debtor could not maintain its facilities or continue to operate its manufacturing business in the

2302963.5

absence of continuous service.  It is therefore critical that the Utility Companies continue to provide uninterrupted services to the Debtor.

96.    The Debtor intends to timely pay its postpetition obligations to the Utility Companies.  The Debtor will make these payments with cash generated during this Chapter 11 Case and pursuant to orders of this Court authorizing the use of cash collateral.

97.    Although the Debtor maintains that its ability to generate cash from operations during this Chapter 11 Case should be sufficient assurance of postpetition payments to Utility Companies, the Debtor proposes to provide a deposit equal to two weeks of utility service, calculated as a historical average over the past twelve (12) months (the "Adequate Assurance Deposit"),[3] to any Utility Company who requests such a deposit in accordance with the provisions of the proposed interim order, provided that such requesting Utility Company does not already hold a deposit equal to or greater than the Adequate Assurance Deposit, and provided further that such Utility Company is not currently paid in advance for its services.

98.    The Debtor believes that most, if not all, of its Utility Companies have adequate assurance of payment even without the Adequate Assurance Deposit.  When the Adequate Assurance Deposit is complemented by the Debtor's ability to pay through access to cash from continued operations, such assurance of payment significantly alleviates—if not eliminates—any honest concern of nonpayment on the part of the Utility Companies, and is thus clearly "adequate."

---

[3]  The Debtor utilizes approximately 60% of the electricity consumed at its 609 Cantiague Rock Road, Westbury, N.Y. location, with the remainder being used by the building's other tenant.  Due to an issue with the building's wiring, all electricity delivered to the building is recorded and billed to the Debtor.  The Debtor then receives a credit from its landlord for that portion of electricity which is not attributable to the Debtor's use.  The amount of the Adequate Assurance Deposit proposed by the Debtor herein is calculated based upon the Debtor's actual electrical usage as opposed to the total electricity delivered to the building.

2302963.5

99.     Moreover, if a Utility Company disagrees with the Debtor's analysis, the Utility Company may file an Objection and negotiate a resolution thereof with the Debtor and, if necessary, seek Court intervention without jeopardizing the Debtor's continuing operations.

100.    Receiving the relief requested in the Utilities Motion is essential for the Debtor to be able to carry out its reorganization efforts.  If the Motion is not granted, the Debtor could be forced to address numerous requests by its Utility Companies in a disorganized manner at a critical point in this Chapter 11 Case.  Moreover, the Debtor could be blindsided by a Utility Company unilaterally deciding, on or after the thirtieth day following the Petition Date, that it is not adequately protected and therefore that it will discontinue service or make an exorbitant demand for payment to continue service.  Discontinuation of utility service, particularly gas, electricity and telecommunications service, could essentially shut down the Debtor's operations, jeopardizing the Debtor's reorganization efforts.  Based on the foregoing, the Debtor submits that granting the relief requested herein is both necessary and appropriate.

F.      **DEBTOR'S MOTION FOR ENTRY OF AN ORDER EXTENDING THE TIME TO FILE SCHEDULES OF ASSETS AND LIABILITIES, SCHEDULES OF CURRENT INCOME AND EXPENDITURES, SCHEDULES OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND STATEMENTS OF FINANCIAL AFFAIRS (the "Schedules Extension Motion")**

101.    The Debtor seeks entry of an order extending the time for the Debtor to file its Schedules and Statements to the date which is forty-five (45) days following the Petition Date.

102.    The Debtor estimates that it has more than 150 creditors and other parties in interest.  Given the size and complexity of the Debtor's business operations, preparing the Schedules and Statements accurately and with sufficient detail will require significant attention from the Debtor's personnel and advisors.  The complexity of the Debtor's businesses, the limited staff available to perform the required internal review of financial records and affairs, the

numerous critical operational matters that the Debtor's accounting and legal personnel must address in the early days of this Chapter 11 Case, the pressure incident to the commencement of this Chapter 11 Case, and the fact that certain prepetition invoices may have not yet been received or entered into the Debtor's accounting system provide ample cause justifying, if not necessitating, the requested extension of the deadline to file the Schedules and Statements.

103.    In addition, the Debtor submits that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this Chapter 11 Case will help the Debtor make a smoother transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest.   Consequently, it is in the best interests of the Debtor and its creditors to obtain an extension of the deadline to file the Schedules and Statements.

**G.    APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF BOND, SCHOENECK & KING, PLLC AS COUNSEL TO THE DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE (the "<u>Bond Retention Application</u>")**

104.    The Debtor seeks entry of an order authorizing the employment and retention of Bond as its legal counsel, *nunc pro tunc* to the Petition Date.

105.    Bond has provided general business and labor law counsel to the Debtor for over 10 years.   In addition, Bond's attorneys have extensive experience, knowledge and resources in the area of debtors' and creditors' rights, and with the bankruptcy courts in this and other jurisdictions.   Bond has the ability to commit substantial resources to legal problems on an urgent basis.   The Debtor, therefore, believes that Bond is well qualified to represent it in this Chapter 11 Case.

106.    In assisting the Debtor with the filing of this Chapter 11 Case and as a result of Bond's prepetition representation of the Debtor, Bond's attorneys have become familiar with the

36

complex factual and legal issues that will need to be addressed in this Chapter 11 Case. The retention of Bond, with its knowledge of and experience with the Debtor and the industry in which it operates, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

107.    Bond is well suited to represent the Debtor in this Chapter 11 Case and has extensive experience in handling large and complex chapter 11 cases. The primary attorneys anticipated to work on this Chapter 11 Case are Stephen A. Donato, Charles J. Sullivan and Grayson T. Walter. Messrs. Donato and Sullivan are members and Mr. Walter is an associate at Bond. Messrs. Donato and Sullivan are members in good standing of the bar of the State of New York; Mr. Walter is a member in good standing of the bars of the States of New York and Illinois.

108.    The Debtor requires Bond to act as its counsel for insolvency and related matters, to render legal services relating to the day-to-day administration of this Chapter 11 Case and the myriad problems that may arise in connection therewith, including, without limitation, the following services:

a.    advising the Debtor of its powers and duties as a debtor in possession;

b.    preparation of the petition, schedules and statement of financial affairs;

c.    negotiations with all creditors, including secured lenders;

d.    examinations of liens against real and personal property, if any;

e.    negotiations with taxing authorities, if necessary;

f.    advising the Debtor regarding matters of bankruptcy law;

g.    representing the Debtor in proceedings and hearings in the United States District and Bankruptcy Courts for the Eastern District of New York;

2302963.5

h.      preparing and filing on behalf of the Debtor, as a debtor in possession, all necessary applications, motions, orders, reports, complaints, answers and other pleadings and documents in the administration of the estate herein;

i.      taking all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions on the Debtor's behalf, the defense of any actions commenced against the Debtor, negotiations in connection with any litigation in which the Debtor is involved, and objections to claims filed against the Debtor's estate;

j.      advising the Debtor concerning, and assisting in the negotiation and documentation of, cash collateral orders and related transactions;

k.      providing assistance, advice and representation concerning any potential sale of the Debtor as a going concern or the sale of all or a significant portion of the Debtor's assets;

l.      providing assistance, advice and representation concerning the confirmation of any proposed plan(s) and solicitation of any acceptances or responding to rejections of such plan(s);

m.      providing assistance, advice and representation concerning any investigation of the assets, liabilities and financial condition of the Debtor that may be required under local, state or federal law;

n.      providing counseling and representation with respect to assumption or rejection of executory contracts and leases, sales of assets and other bankruptcy-related matters arising from this case;

o.      rendering advice with respect to general corporate and litigation issues relating to this case, including, but not limited to, securities, corporate finance, labor, intellectual property, tax and commercial matters; and

p.      all other pertinent and required representation in connection with the provisions of the Bankruptcy Code.

109.    In addition, the Debtor anticipates that it will continue to require the services of Bond on general business, labor law, and other matters not directly related to this Chapter 11 Case.

110.    The Debtor believes Bond represents no interest adverse to the Debtor in accordance with 11 U.S.C. § 327.

2302963.5

111.    The Debtor believes that the employment of Bond would be in the best interests of the Debtor and its estate and desires to employ Bond, effective as of the Petition Date, with compensation to be determined upon application to this Court.  Were the Debtor required to engage counsel other than Bond in connection with these proceedings, the Debtor, its estate and all parties in interest would be unduly prejudiced by the time and expense necessarily attendant to such counsel's familiarization with the intricacies of the Debtor's business and financial affairs.

112.    During the course of representing the Debtor as set forth herein, the services of Bond may be necessary for other duties not enumerated herein and not known at this time.  In the event the services of Bond are required for unusual or extraordinary matters beyond the scope or intent of this application, the Debtor will make an additional application for such authorization.

**H.    APPLICATION OF THE DEBTOR FOR ENTRY OF AN ORDER AUTHORIZING THE EMPLOYMENT AND RETENTION OF ALDERMAN & COMPANY CAPITAL, LLC AS INVESTMENT BANKER FOR THE DEBTOR *NUNC PRO TUNC* TO THE PETITION DATE (the "ACC Retention Application")**

113.    The Debtor seeks entry of an order authorizing the employment and retention of ACC as its investment banker.

114.    The Debtor operates in a highly specialized niche market and requires the services of a seasoned investment banker to assist it in identifying a buyer for all or substantially all of its assets as contemplated in this Chapter 11 Case.

115.    ACC has significant expertise and contacts in the Debtor's industry.  In addition, as described above, prior to the Petition Date, the Debtor retained the services of Alderman Consulting, an affiliate of ACC, to solicit interest for the potential sale of some or all of the Debtor's business lines and assets.  Accordingly, ACC is familiar with the Debtor's product lines, business operations, capital structure, financing documents and other material information

39

2302963.5

and is able to assist the Debtors in pursuing a sale.  The retention of ACC, with its knowledge of and experience with the Debtor and the industry in which it operates, will assist in the efficient administration of the estate, thereby minimizing the expense to the estate.

116.    The services to be provided by ACC include:

a.      Assisting the Debtor in assembling a virtual data room to allow prospective purchasers to conduct diligence with respect to a potential sale of the Debtor's assets;

b.      Preparing detailed financial projections for the Debtor, including income statements, balance sheets and cash flow projections;

c.      Preparing a confidential information memorandum for use in the Debtor's sale process;

d.      Soliciting interest and bids from prospective purchasers with respect to a sale of all or substantially all of the Debtor's assets;

e.      Generally assisting the Debtor with respect to evaluating bids received and facilitating the diligence efforts of potential purchasers; and

f.      Advising and assisting the Debtor in connection with the negotiation and documentation of a potential sale.

117.    The Debtor believes that ACC is well qualified to provide its services to the Debtor in an efficient and timely manner.  The Debtor submits that the employment and retention of ACC would be in the best interest of the Debtor, its estate and creditors.

*[signature page follows]*

2302963.5

I swear, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

Theodore B. Smith, III

Further affiant sayeth not.

Sworn to before me this
30th day of April, 2014.

Notary Public

ROSEANN CORRADO
Notary Public, State of New York
No. 01CO6131892
Qualified in Nassau County
Commission Expires August 22, 20 17

41

2302903.5